# Grayson *v.* DuBose.

*Bill to Foreclose Mortgage.*

(Decided Feb. 10, 1910.  Rehearing denied June 30, 1910.
52 South. 923.)

Appeal from Madison Law and Equity Court.
Heard before Hon. Tancred Betts.

Bill by W. T. DuBose against Mayme C. Grayson, to foreclose a mortgage, with cross bill by respondent to declare the mortgage void and cancel it, because given as security for the husband's debt. From a decree granting the relief prayed by the complainant and denying relief under the cross bill, respondents appeal. Affirmed.

LAWRENCE COOPER, JAMES H. BALLENTYNE, and S. S. PLEASANTS, for appellant.

BRICKELL & SMITH, for appellee.

MAYFIELD, J.—The majority of the court, after full consideration of this case, are of the opinion, and so decide, that the decree of the chancellor or trial court is correct, and that there is no reversible error in the record.

From this conclusion, however, MAYFIELD, J., dissents, and expresses the following views, in which EVANS, J., concurs:

MAYFIELD, J. (dissenting).—The appellee filed his bill against the appellant, a married woman, to foreclose a certain mortgage on a lot in Huntsville, Ala., by her and her husband executed to appellee to secure the payment of a note executed by appellant alone. The appellant answered the bill, and made her answer a cross-bill, thereby seeking to have the mortgage declared void, because it was executed on her property, not to secure her debt, but that of her husband, and was therefore void under the statute of this state (Code, § 4497), which prohibits the wife from directly or indirectly becoming surety for her husband.

There are but two questions disputed—but two necessary to be decided—and the determination of these

will afford a correct decision and disposition of all ques-
tions raised on this appeal: (1) Was the debt secured
by the mortgage that of the wife or of her husband (it
being indisputably shown to be that of the one or of the
other, and not, of both).? (2) If the debt of the hus-
band, was the wife estopped from showing the truth of
the matter?

The record, we think, conclusively shows that in truth
and in fact it was the debt of the husband, though writ-
ings speak the contrary. The writings and the parol ev-
idence, taken together, show a clear attempt to evade or
avoid the statute. It is clearly shown that the wife did
not borrow the money, that she did not want it, and did
not want her husband to borrow it, but that under the
influence of her husband she finally consented to make
the application, and to sign the note and mortgage and
receipt, all at the same time; that by this means the
husband, and not she, really obtained the loan, though
on the face of the papers it is made to appear that she
was the borrower; that in order to perfect this plan,
and in order that the transaction should apparently be
within the law (when as a matter of fact and truth it
was clearly a violation of the law), the $1,000.00 loaned
and to be secured by the mortgage—every dollar in gold
—was brought to her at her house, and delivered manu
captu, and she was requested to count it, which she de-
clined to do, saying that she did not want it; and ac-
cording to her testimony she wept because she had thus
to receive it and to sign the papers necessary to get that
which she did not want—that which, as a matter of
fact, it was never intended she should enjoy, and which,
in reality, she was not allowed to retain. Her obtaining
this money, as is clearly shown, would have rendered
the loan absolutely useless to her or to anyone else; her
having or owning the money would no more have served

the only purpose of the loan than if it had never been made.

The undisputed evidence shows that this formality of her signing the application, note, mortgage, and receipt, and acknowledging the same, and receiving the counted money, was no sooner consummated than the money was, without her consent, taken from her and delivered to the attorney who borrowed it from the mortgagee (ostensibly for her, but really for her husband), and by him paid over, together with $1,400 or $1,500 of the husband's money in settlement of a debt of the husband, amounting to about $2,500, which was necessary to be paid on that particular day or the next, in order to redeem some property of the husband which had been in litigation conducted for the husband by this same attorney, and which, by decree of the court or operation of law, would be lost unless redeemed on one or the other of said days. The evidence leaves no room to doubt that this was the purpose, and the only purpose, for which the loan was negotiated.

While the attorney who negotiated the loan says the husband told him his wife wanted it, and while this may be true, yet it was only a part of the necessary plan to comply with the statute. He could not, under all the facts, have been unconscious of the fact that it was the husband who desired the loan, and that he had to have it by the given date. If the contrary had been true, why the haste in negotiating the loan by telephone, and of having the check cashed in gold before the closing of the bank? The wife was not shown to have needed the money, nor indeed to have wanted it, unless for the creditors of the husband; and, if for this object, the attorney was certainly chargeable with knowledge that it was in truth the husband who wanted it. She being so nigh at hand, assuredly this was enough to cause the attor-

[Grayson v. DuBose.]

ney to inquire of her as to the facts before negotiating the loan in such haste.

We do not mean to charge bad faith on the part of the attorney or that of the husband. The husband was in dire distress; the attorneys were evidently trying as best they could to save his property, and thus, incidentally, to save the wife, but, in order to do this, it appears that it was necessary to avoid the statute, and this was clearly attempted to be done. There was nothing criminal in this, but nevertheless the act was void, because the statute makes it so.

Next, is the wife estopped, by signing the application, the note, mortgage, and receipt, from now disputing same? We think not. The parties who induced her to sign it either knew that the loan was not for her, but for her husband, or were chargeable with knowledge thereof. Certainly they had such notice of these facts as was sufficient to charge them with knowledge. The husband says it was his debt, and that the attorneys knew it, the wife says it was his debt and that the attorneys knew it; and the attorneys say that they did not know it, but they do admit having had cognizance of facts as were sufficient to charge them with knowledge. The wife made no representations whatever, directly to the mortgagee, to procure the loan; all that were made were made by the attorney. The attorney did not profess to be employed directly by her to negotiate the loan, but only indirectly by her husband, who professed to be her agent, and who now says he was not her agent. As said above, we think that all the evidence shows he was not her agent in negotiating the loan, but was acting for himself. It is unnecessary to try to reconcile the testimony of the attorney with that of the husband, or to decide which was correct; the result must be the same in any event.

The attorney who negotiated the loan evidently represented both parties to the transaction. All the evidence shows that the husband requested him to make the loan—the husband saying it was for himself; the attorney, that the husband as the agent of the wife employed him; and the mortgagee saying that, on account of the confidence he had in the attorney, he was willing to risk the loan to him—had employed no one to represent him in the transaction, and omitted to look after it himself.

If the mortgagee was not represented by the attorney who negotiated the loan, then he was not represented at all. He of course consented to it, and sent the check; but the terms of the security, the execution of the mortgage, and the recording thereof, and the collection of the interest, at least, were matters intrusted to the same attorney who represented the mortgagor and the loanee. So whatever knowledge or notice the attorney had as to this matter, both parties were chargeable with.

It appears that the attorney had not only represented both parties on former occasions, but was exceedingly friendly with both, being, besides their attorney, the nephew of the mortgagors; that the mortgagee was an intimate friend of his, between whom and himself there subsisted an unusual degree of mutual confidence and trust; that by an agreement with this mortgagee the attorney had, on former occasions, used the name of the mortgagee in making loans in Huntsville, when the money lent was in fact that of the attorney himself. And evidently, in this transaction in hand, he represented both parties—not for any improper purpose, but because of his friendship and relations to all the parties concerned; not upon consideration of any profit to himself for such service, for he received none, but purely to save both parties costs and time. Both the mortgagor

[Grayson v. DuBose.]

and her husband knew full well as to the attorney's relations in the matter; neither of them could have been deceived therein because both were cognizant of the double capacity in which his services were rendered.

The statute in question shows by its very working that the legislators expected that attempts would be made to avoid it, and consequent care to prevent its successful avoidance. It (the part in question) reads thus: "But the wife shall not *directly or indirectly* become the surety for the husband." This is exactly what was attempted to be done in the case at bar. The money obtained was not hers at all, and was not intended for her; its temporary delivery to her was purely formal, and made under the idea that it was a compliance with the statute. That thereby it was constituted *her* loan. But the money obtained was used by the husband, on the very day it was procured, for the only purpose for which it was borrowed. He no doubt intended to pay the debt himself, and, had be been able to pay it, his wife would probably never have heard of it. He did pay the interest, without her knowledge or consent, and later procured an extension of the loan; and it was only upon his failure and bankruptcy that resort was had to the surety, the wife.

It is true that the wife, under our statutes, can mortgage or sell her property, and may use the proceeds obtained thereby in payment of the husband's debts, without violating the statute.—*Sample v. Guyer,* 143 Ala. 615, 42 South. 106; *Hamil's Case,* 127 Ala. 90, 28 South. 558; *Hollingsworth v. Hill,* 116 Ala. 184, 22 South. 460; *American Mortgage Co. v. King,* 105 Ala. 358, 16 South. 889; *Ginn v. N. E. Mortgage Co.,* 92 Ala. 135, 8 South. 388; *American Mortgage Co. v. Thornton,* 108 Ala. 258, 19 South. 529, 54 Am. St. Rep. 148. But the wife cannot, under the guise of doing this, mortgage her lands to

secure a dept of the husband. He and she, by making the papers recite that it is her debt, cannot make it so, if in fact it is not, unless by way of estoppel. Of course they will not be allowed to perpetrate a fraud upon an innocent purchaser or mortgagee without notice of the fact that it was the husband's debt; neither will they be permitted to violate the statute by making what is in form an absolute sale and deed of her property, but which is in fact only a mortgage of her property to secure his debt, but of course if the purchaser was not a party to the transaction, and was not chargeable with notice of the real truth, he would be protected, because they would be estopped from showing the truth.—*Henderson v. Brunson*, 141 Ala. 674, 37 South. 549.

The doctrine of estoppel as to married women is not very certain or well defined. The uncertainty to some degree results from the fact that the statutes in the various states, for the last 100 years, have been constantly changing her common-law rights, powers, and duties, which modifications necessarily more or less affect the rule and doctrine of estoppel as applied to her. At one time, under the common law, she could not contract at all, and for that reason could not be bound by estoppel. By statutes her disabilities have more or less been removed; and where so removed as to allow her to contract, she can be bound by estoppel as to matters embraced in her contracts.—*Vincent v. Walker*, 93 Ala. 165, 9 South. 382. As a general rule, a married woman is not estopped from asserting her title to her land, except by fraud. She must and can convey it only in the mode and for the purpose authorized by law. But a married women who executes a deed or other conveyance to her land, upon a sufficient consideration and in the manner prescribed by statutes, is thereby estopped to deny its validity, or to set up an after-acquired title

thereo.—*Harden v. Darwin,* 77 Ala. 472; *Parker v. Marks,* 82 Ala. 548, 3 South. 5; *Zimmerman v. Robinson,* 114 N. C. 39, 19 S. E. 102. But if the deed be executed not as prescribed by statute, or founded on a consideration not authorized by law, she is not estopped thereby.

Where the husband is authorized to act as the agent of the wife, and, with her consent, wrongfully appropriates her property to his use, the wife is estopped from reclaiming the property, in the absence of fraud on the part of the husband and on the part of the assignee of the property wrongfully converted by the husband to his use.—*Bank v. Nelson,* 106 Ala. 535, 18 South. 154.

It is said that no person can be estopped by an act that is in itself illegal and void; that conveyances cannot be affected by the doctrine of estoppel, which the law expressly prohibits, otherwise the law would provide for its own evasion; but an apparent exception to this rule is that no one will be allowed to take advantage of his own wrong—to acquire an advantage over an innocent person who relied upon and acted upon the wrong, not knowing the truth, and not being chargeable with knowledge thereof.—*Vincent v. Walker,* 93 Ala. 165, 9 South. 382; *Russell v. Peavy,* 131 Ala. 567, 32 South. 492; *Shook's Case,* 140 Ala. 577, 37 South. 409.

The statute in question has been often construed by this court, and has been held to be founded upon public policy, to protect the estate of the wife against the influence of the husband or other persons, or even against her own inclination to subject it to her husband's debts. The wife being expressly prohibited by statute from so contracting to secure her husband's debts, she is not, and ought not to be, estopped to deny her power to do what the law forbade. Equity will not, by setting up an estoppel against her, accomplish the exact thing that

the statute and public policy prohibit.—*Richardson v. Stephens,* 122 Ala. 301, 25 South. 39; *Elston v. Comer,* 108 Ala. 76, 19 South. 324; *Russell v. Peavy,* 131 Ala. 567, 32 South. 492. But these cases do not hold, nor recognize the law to be, that the wife may not estop herself by actual fraud, or concealment or suppression of the truth.

Was there such fraud on the part of the wife in this case as to estop her? We think not. She was guilty of no fraud, intended none, and committed none. The record shows that the mortgagee had parted ·with the money before she ever made any application or had any knowledge of the loan. True, she signed an application for the loan, and signed a receipt for the money, concurrently with the signing of the note and mortgage, but this was clearly done under the influence of her husband, against her wishes and protest, and to enable him to secure the loan for himself. The husband may have deceived the attorney and the mortgagee, but she did not. It is not at all certain that the mortgagee was deceived by any one. The attorneys, if they did not have actual knowledge of all the facts, were unquestionably chargeable therewith; and certainly the wife did not deceive or mislead them because she did only what her husband requested and insisted that she do, and even this over her protest. She did not profit a cent by the transaction, and it was never contemplated that she should do so. If she had accepted and retained the money when tendered to her, it would not have been negotiated had the husband or the attorneys known that it would not be used to pay off the balance of the husband's debt, necessary to redeem his land, to which purpose it was almost simultaneously applied.

It does not seem that the mortgagee should lose his debt, but it is equally hard that the wife should lose her

home and her all. Courts must construe the law as it is written, and not as it ought to be. We sit here "dicere, et non dare legem."

The statute clearly and surely expressly forbade this transaction of the wife's—the executing of this mortgage to secure the debt of the husband. As long as the statute exists it should be upheld.

In my opinion the decree of the chancellor should be reversed, and a decree here rendered, granting the relief prayed in the cross-bill.

In accordance with the conclusion of the majority of the court the decree of the chancellor is affirmed.

Affirmed.

DOWDELL, C. J., and SIMPSON, McCLELLAN, and SAYRE, JJ., concur. MAYFIELD and EVANS, JJ., dissent.